UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

GARY GIBSON                                    CIVIL ACTION NO. 3:13-cv-0036
         LA DOC #469104
                                               SECTION P
VS.
                                               JUDGE DONALD E. WALTER

BURL CAIN, WARDEN                              MAG. JUDGE KAREN L. HAYES

REPORT AND RECOMMENDATION

On January 7, 2013, *pro se* Petitioner Gary Gibson, a prisoner in the custody of

Louisiana's Department of Corrections, filed the instant Petition for writ of *habeas corpus*

pursuant to 28 U.S.C. § 2254.  [doc. # 1].  Petitioner attacks his second degree murder conviction

and the life sentence imposed by the Third Judicial District Court, Union Parish.  This matter has

been referred to the undersigned for review, report, and recommendation in accordance with the

provisions of 28 U.S.C. § 636 and the standing orders of the Court.  For reasons assigned below,

it is recommended that the Petition, [doc. # 1], be **DENIED**.

## Background

On June 8, 2005, Petitioner was charged with the second degree murder of Freddrick

Gray.  [doc. # 23-3, p. 1].  Trial began on March 20, 2007, [doc. # 23-4, p. 48], and on March 21,

2007, a jury found Petitioner guilty as charged.  [doc. # 23-3, p. 173].  On May 16, 2007,

Petitioner was sentenced to life imprisonment at hard labor without benefit of probation, parole,

or suspension of sentence.  [doc. # 23-4, p. 42].

Petitioner appealed and argued that the evidence was insufficient to convict him.  [doc. #

23-5, p. 161].  The Second Circuit Court of Appeal affirmed his conviction and sentence.  *Id.*

Petitioner then filed a *pro se* application for a +supervisory writ of review with the Louisiana

Supreme Court raising the same claim of insufficient evidence.  [doc. # 1-1, p. 21].  On

December 12, 2008, the Louisiana Supreme Court denied his application.  *State v. Gibson*, 997 So. 2d 560 (La. 2008).  Petitioner did not seek further direct review in the United States Supreme Court.

On January 23, 2009, Petitioner filed a *pro se* application for post-conviction relief in the trial court.  [doc. # 23-6, p. 65].  There, Petitioner raised the following claims:

> (1) Petitioner was denied due process and equal protection of the sixth and fourteenth amendments when the trial court did not allow Petitioner to withdraw his plea of not guilty and enter a plea of not guilty by reason of insanity;
>
> (2) Petitioner was denied due process and equal protection of the sixth and fourteenth amendments when the court allowed the State to purposefully discriminate by using peremptory challenges to exclude African Americans from the jury;
>
> (3) Ineffective assistance of both trial and appellate counsel for failing to investigate Petitioner's insanity defense and for failing to raise significant issues on appeal; and
>
> (4) Petitioner's fifth, sixth, fourteenth, and eighth amendment rights were violated due to an invalid indictment that omitted elements of the offense.

[doc. # 21-5, p. 183].  The trial court denied Petitioner's application with respect to claims one and three on June 24, 2010.  [doc. # 23-6, p. 7, 9].  On December 9, 2010, the trial court denied the application with respect to claims two and four.  *Id.* at 25.  On February 11, 2011, the Second Circuit Court of Appeal denied Petitioner's writ application.  [doc. # 1-1, p. 3].  On January 13, 2012, the Louisiana Supreme Court likewise denied Petitioner's writ application.  *Id.* at 26.

Petitioner filed the instant Petition on January 7, 2013.  [doc. # 1].  However, the Petition did not specifically set forth Petitioner's claims for relief.  Instead, Petitioner merely attached two memoranda of law that were used to support his writ applications before the Louisiana Supreme Court on direct and collateral review.  [doc. # 1-1].  The Court, in response, ordered Petitioner to amend his Petition to include a memorandum in support that designated specific claims for relief

and demonstrated that each claim was properly presented to the Louisiana courts.  [doc. # 8, p. 4].[1]  On August 23, 2013, Petitioner filed an amended Petition that complied with the Court's Order.  [doc. # 13].[2]   The amended Petition requests relief for the first three claims that Petitioner raised in his application for post conviction relief, as well as an additional claim of insufficient evidence.  [doc. # 13].

The matter is now before the undersigned.

## Law and Analysis

### I.      Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider *habeas* claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  An inmate must show that the adjudication of the claim in state court:

(1)  resulted in  a  decision  that  was  contrary  to,  or  involved  an  unreasonable

---

[1] Rule 2 of the Rules Governing Section 2254 Cases states that a *habeas* petition must specify all ground for relief available and state the facts supporting each ground.  RULES GOVERNING § 2254 CASES, RULE 2, 28 U.S.C.A.

[2] Respondent contends that the Petition should be dismissed because—while conceding that the initial Petition was timely—the amended Petition was untimely.  Respondent is correct in noting that the amended Petition fell outside of the one-year statute of limitations for filing *habeas* petitions as set forth in 28 U.S.C.A. § 2244(d)(1).  However, this Court will not dismiss the Petition as untimely because the initial Petition, however deficient, set forth the substance of Petitioner's claims.  *See Mayle v. Felix*, 545 U.S. 644, 645 (2005) (holding that Rule 15(c) of the Federal Rules of Civil Procedure allows a petitioner to amend his petition to add claims after the one-year statute of limitations has expired as long as the facts supporting the new claims do not differ in time and type from those alleged in the original, timely-filed petition).  In addition, the one-year limitations period lapsed while the Court was performing its preliminary review of the matter.  In that vein, the Court will not make the timeliness of the Petition contingent upon the speed of the Court's own preliminary review.

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)).  "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 740.  Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## II.    Petitioner's Claims

### A. Claim One: Denial of Due Process Due to Trial Court Error

Petitioner first claims that the trial court erroneously denied his motion to withdraw his plea of not guilty and enter a plea of not guilty by reason of insanity.  [doc. # 13, p. 8]. According to Petitioner, the trial court's denial "left [him] barred from presenting any evidence

4

of his history of mental illness at trial, essentially leaving him defenseless." *Id.* He argues that the trial court's ruling effectively "usurped the jury's role [in deciding] the ultimate merits of the insanity defense." *Id.* at 9.

Petitioner moved to change his plea on the eve of trial. [doc. # 21-3, p. 187]. A summary of the criminal case minutes shows that the trial court denied the motion "for reasons orally assigned." *Id.* A copy of the transcript of the court proceedings is not in the record and, according to Respondent, is not available. [doc. # 21-1, p. 25]. Petitioner, as a result of the transcript's absence, contends that the record is inadequate for full review. [doc. # 13, p. 9-10].

Essentially, Petitioner challenges the state court's application of Louisiana law. In Louisiana, a "defendant may withdraw a plea of 'not guilty' and enter a plea of 'not guilty and not guilty by reason of insanity,' within ten days after arraignment." LA. CODE CRIM. PROC. ANN. art. 561. "Thereafter, the court may, for good cause shown, allow such a change of plea at any time before the commencement of the trial." *Id.* "A defendant's burden of showing good cause to grant a motion to change plea logically increases each day that his trial date nears." *State v. Jason*, 779 So. 2d 865, 874 (La. App. 4 Cir. 2000). The trial court here, undoubtedly, determined that Petitioner failed to establish the good cause that Article 561 requires.

While the transcript of the hearing on Petitioner's motion would likely be necessary to review the trial court's good cause determination, this Court need not review it because this Court does not review state court determinations regarding issues of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). In other words, the transcript is not necessary because Petitioner cites no Supreme Court

5

authority for the proposition that a criminal defendant has a constitutional right to change a plea from not guilty to not guilty by reason of insanity on the eve of trial.  *See id.* ( "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.

To be sure, Petitioner does argue, in conclusory fashion, that his due process rights were violated because an "accused has the constitutional right to have his defense of insanity tried by [a] jury."  [doc. # 13, p. 9].  He also argues, conclusorily, that "an essential component of procedural fairness is an opportunity to be heard."  *Id.*  However, with regard to the former argument, Petitioner cites only to a Louisiana case which, in turn, provides no Supreme Court authority for Petitioner's proposition.  As to the latter argument, Petitioner cites to an inapposite concurring opinion of Justice O'Connor in *Montana v. Egelhoff*, 518 U.S. 37, 64 (1996).  Despite what Petitioner argues, the *Montana* majority held that the due process clause does not guarantee the right to introduce all relevant evidence; rather, a state can limit the introduction of relevant evidence for a "valid" reason and can even make changes in its criminal law that have the effect of making it easier for the prosecution to obtain convictions.  *Id.*  The *Montana* Court did not address the specific issue presented here.

Ultimately, Petitioner presents no constitutional violation.  *See Battie v. Estelle*, 655 F.2d 692, 702 (5th Cir. 1981) (noting that there is no federal constitutional right to present an insanity defense); *Williams v. Wainwright*, 712 F.2d 1375, 1376 (11th Cir. 1983) (holding that the denial of the right to present an insanity defense does not violate a defendant's rights under the Sixth and Fourteenth Amendments where the state court ruled that there was no evidence to support that defense).  Accordingly, Petitioner has failed to demonstrate that the trial court's denial of his

motion to change his plea was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.   Petitioner's claim should be **DENIED**.

B. Claim Two: _Batson_ Challenge

Petitioner argues that he was denied due process and equal protection of the Sixth and Fourteenth Amendments when the trial court allowed the State to purposefully discriminate against him by using peremptory challenges to exclude African Americans Honeycutt and Fields from the jury.  [doc. # 13, p. 10].

_Batson_ requires defendants to demonstrate that the State used peremptory challenges in violation of the Equal Protection Clause.  _Batson v. Kentucky_, 476 U.S. 79, 96-98 (1986).  Since _Batson_ is clearly established Supreme Court precedent under 28 U.S.C. § 2254(d)(2), Petitioner must demonstrate that the trial court's decision in not finding a _Batson_ violation was either contrary to or involved an unreasonable application of _Batson_.

In _Batson_, the Court created a three-step analysis for trial courts to use in evaluating a defendant's claim of a racially discriminatory peremptory challenge.  _Id._ at 96-98.  First, "a defendant must make a _prima facie_ showing that the prosecutor exercised his peremptory challenges on the basis of race."  _Id._ at 96.  Second, "[o]nce the defendant makes a _prima facie_ showing, the burden shifts to the State to come forward with a [race] neutral explanation" for the use of the peremptory challenge.  _Id._ at 97.  Third, and finally, the "trial court then will have the duty to determine if the defendant has established purposeful discrimination."  _Id._ at 98.

In _Hernandez v. N.Y._, 500 U.S. 352, 360 (1991), the Supreme Court held that the reasons offered to explain the exercise of a peremptory challenge should be deemed race-neutral unless a

discriminatory intent is inherent in those reasons.  A reviewing court should give a trial judge's

findings on discriminatory intent great deference and should not reverse them unless they are

clearly erroneous.  *Id.* at 364-65.  The presumption of validity attaching "to a trial court's factual

finding at *Batson's* third step . . . is doubly strong when the *Batson* finding is under collateral

attack in habeas."  *Miller-El v. Dretke*, 545 U.S. 231, 284 (2005).  Likewise, the Court in *Rice v.

Collins*, 546 U.S. 333, 334 (2006), admonished courts not to substitute their evaluation of the

record for that of the trial judge.

  Here, Petitioner's counsel established a *prima facie* case under *Batson* by pointing out

that the State made two consecutive peremptory challenges against African Americans.  [doc. #

21-4, p. 188].  Then, consistent with *Batson's* second step, the trial court asked the State to

respond to Petitioner's challenge.  *Id.*  The State, in response, offered the following race-neutral

reasons for peremptorily challenging prospective jurors Honeycutt and Fields:

> <u>State</u>: I struck Camilla Honeycutt.  Our office has prosecuted Ms. Honeycutt on two
> different occasions and convicted her.  [Defense counsel] defended her and she said
> that she was pleased with his representation.
>
>          * * *
>
> <u>State</u>: [Ms. Fields] had several family members that have been convicted of
> offense[s] and I think – I may be mistaken, but I think based on that is why I
> recommended we – peremptorily challenge[d] her – because of family member
> convictions.
>
>
>          * * *
>
> <u>State</u>: [When asked if] any family member [had] been convicted of a felony, [Ms.
> Fields stated that] Kendal Fields and Joey Fields [were convicted of] carnal
> knowledge of a juvenile and drugs.  I remember personally, prosecuting Kendal
> Fields on some drug cases and he's convicted and he's still in the penitentiary, I
> believe, so – She has some – two family members that have been convicted.

[doc. # 21-4, p. 188-189].  Proceeding in accordance with *Batson's* third step, the trial court was satisfied with the State's proffered race-neutral reasons and denied Petitioner's challenge, stating, "All right, I'll note your objection but I'll over-rule it and find that there's reasons other than race."  *Id.* at 189.

The trial court was in the best position to gauge the prosecutor's intentions for challenging the five jurors and to observe firsthand the demeanor of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript.  Indeed, as Petitioner himself notes, "these determinations of credibility and demeanor lie 'peculiarly within a trial judge's province' . . . ."  [doc. # 13, p. 11 (citing *Hernandez*, 500 U.S. at 365)].  Upon consideration, there is nothing in the record to show that the trial court unreasonably applied *Batson* in determining that the State's race-neutral explanations for challenging the five jurors were credible.  Accordingly, Petitioner's claim should be **DENIED**.

C. Claim Three: Ineffective Assistance of Trial and Appellate Counsel

Petitioner next claims that his trial counsel was ineffective for failing to investigate an insanity defense and for failing to present evidence that Petitioner's hand, at the time of the murder, was too injured to fire the murder weapon.  [doc. # 13, p. 18-20].  In addition, Petitioner claims that his appellate counsel was ineffective for failing to argue that the trial court should have declared a mistrial due to the prejudicial remarks made by a witness.  *Id.* at 20-23.

Ineffective assistance of counsel claims may be considered under 28 U.S.C. § 2254.  *See Clark v. Thaler*, 673 F.3d 410 (5th Cir. 2012); *Amos v. Thornton*, 646 F.3d 199 (5th Cir. 2011).  Substandard advice of counsel rises to a constitutional violation only if the substandard conduct

deprives the petitioner of his constitutional right to a fair trial or deprives the petitioner of some other constitutional right. *Strickland v. Wash.*, 466 U.S. 668, 686-87 (1984).  To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the ineffectiveness of counsel prejudiced him. *Id.*

If the petitioner does not make a sufficient showing as to one prong of the test, the other prong need not be considered. *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997).  The prongs of the test also need not be analyzed in any particular order.  *Goodwin v. Johnson*, 132 F.3d 162, 172 n.6 (5th Cir. 1997).  Furthermore, "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." *Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

In applying the first prong of *Strickland*, a court should presume that the attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy.  *See Strickland*, 466 U.S. at 689-90.  The petitioner must show that the performance of counsel fell "outside the wide range of professionally competent assistance." *Id.* at 690; *Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994).

To establish prejudice, the second prong, the petitioner must demonstrate that counsel's actions "were so serious as to render the proceedings unreliable and fundamentally unfair." *U.S. v. Saenz-Forero*, 27 F.3d 1016, 1021 (5th Cir. 1994); *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984).  Unreliability and unfairness do not result "if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993); *see also Mangum v. Hargett*, 67 F.3d 80, 84 (5th

10

Cir. 1995).  Accordingly, counsel cannot be ineffective for failing to raise a meritless claim,

*Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995), and prejudice generally exists only if the

defendant demonstrates that he would have received less jail time.  *U.S. v. Grammas*, 376 F.3d

433, 436 (5th Cir. 2004).

Finally, when review is governed by the AEDPA, review of the state court's resolution of

the ineffective assistance of counsel claim is "doubly deferential," *Knowles v. Mirzayance*, 556

U.S. 111, 112 (2009), since the question is "whether the state court" application of the *Strickland*

standard was unreasonable."  *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).  Importantly,

"[t]his is different from asking whether defense counsel's performance fell below *Strickland's*

standard," because the "state court must be granted a deference and latitude that are not in

operation when the case involves review under the *Strickland* standard itself."  *Id.*  Consequently,

"even a strong case for relief does not mean the state court's contrary conclusion was

unreasonable."  *Id.* at 786.  To obtain relief, a Petitioner must show that the state court's ruling

on the claim was "so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 786-

87.

*i. Trial Counsel*

Petitioner first claims that trial counsel was ineffective for failing to investigate an

insanity defense.  [doc. # 13, p. 18].  Petitioner claims that he informed counsel of his history of

suffering from a mental disorder and asked counsel on numerous occasions to investigate his

mental history.  *Id.* at 18-19.

When assessing the reasonableness of an attorney's investigation, a court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005), (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).  "Counsel is not required to pursue every path until it bears fruit or until all conceivable hope withers." *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980).  In order to establish that an attorney was ineffective for failing to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial.  *Miller*, 420 F.3d at 361. "[W]ithout a specific, affirmative showing of what the missing evidence or testimony would have been, a habeas court cannot even begin to apply *Strickland's* standards because it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance." *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994).

Here, Petitioner does not specify what evidence further investigation would have revealed.  For example, Petitioner does not present any evidence of prior mental disorders.  Thus, the Court cannot conclude, from Petitioner's unsupported claim, that counsel's performance was deficient.

Petitioner also claims that trial counsel was ineffective for failing to present evidence of an injury to Petitioner's hand—an injury that, according to Petitioner, would have prevented him from firing the gun that killed the victim.  [doc. # 13, p. 18].  Petitioner does not elaborate on this claim.  As he raises this claim in a wholly conclusory fashion, fails to allege any specific facts, and fails to furnish any evidence, the Court concludes that the unsupported allegations are

12

insufficient to overcome the strong presumption that counsel provided effective assistance.  *See Uresti v. Lynaugh*, 821 F.2d 1099, 1103 (5th Cir. 1987) (holding that a *habeas* petitioner has the burden of proving facts in support of his or her claim and unsupported, conclusory allegations do not warrant *habeas* relief).

In any event, the trial court, on collateral review, denied Petitioner's ineffective assistance of trial counsel claims.  [doc. # 23-6, p. 9].  In light of the Court's reasoning above, Petitioner has failed to establish that the trial court was unreasonable in finding that he failed to overcome the strong presumption that trial counsel acted competently.  The state court's denial of these claims was neither contrary to, nor the result of an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States in *Strickland*.  Accordingly, it is recommended that these ineffective assistance of counsel claims be **DENIED**.

*ii. Appellate Counsel*

Petitioner claims that his appellate counsel was ineffective for failing to raise "several significant issues" on direct appeal.  [doc. # 13, p. 21].  However, Petitioner only presents one of the alleged "significant issues" that counsel should have raised.[3]  Namely, Petitioner claims that appellate counsel failed to argue that the trial court should have granted a mistrial when witness LaTonya Simmons, Petitioner's former girlfriend, prejudicially stated that Petitioner had a criminal record.  *Id.*

An appellate counsel is not required to raise all non-frivolous issues on appeal, even if the

_____

[3] To that end, the Court declines Petitioner's ostensible invitation to sift through the record and find the other "significant issues" that appellate counsel should have raised.  It is not the Court's obligation to comb through the record in search of evidence that might support Petitioner's conclusory allegations.

defendant requests that the issues be raised.  *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of rigorous and effective advocacy . . . .").  Similarly, counsel does not perform deficiently by failing to pursue an argument that has no validity or hope of success.  *U.S. v. Gaudet*, 81 F.3d 585, 591 (5th Cir. 1996).  When appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain an ineffective assistance claim based on allegations that counsel was deficient for failing to assert other claims.  *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

The following exchanges took place at Petitioner's trial:

<u>State</u>: You chose to break up with [Petitioner] before Christmas?

<u>Witness</u>: Yes.

<u>State</u>: How much time had passed between your break-up with [Petitioner] and the day [the victim] died?

<u>Witness</u>: Uh, it was, I think, almost – it was – I'm not sure, but it had been awhile, because actually, [Petitioner] was in jail when I left him alone – me and Meco was together.

<u>Counsel</u>: Your Honor –

(Inaudible – voices overlap)

<u>Counsel</u>: Sidebar.

<u>Court</u>: All right.  Could you take the jury out a moment, please?

(THE JURY EXITS THE COURTROOM)

<u>Counsel</u>: (Unintelligible) moving for a mis-trial – she stated that he was in jail and has a criminal record and I think that's tainted the jury and –

14

Court: Do you have a response?

State: I think an admonition would suffice.  The question was posed, I had no idea what the answer was going to be, but the question had to be asked because of the cross-examination.  Because the cross-examination left the jury thinking that she had jilted the defendant right before the Christmas holidays and I had to – I had to ask the question to establish that that had been almost two years prior.

Counsel: She could answer the question very easily, Your Honor, without saying he was in jail.  When she said he was in jail then that –

[doc. # 23-5, p. 27-28].  After reviewing the law on the issue, the trial judge found that the remark was inadvertent, denied counsel's request for mistrial, and then asked counsel if he wanted an admonishment.  *Id.* at 29.  Counsel then stated that the defense would prefer not to admonish the jury because any admonishment might draw unwanted attention to the prejudicial remark.  *Id.*

This Court rejects the instant claim.  First, as in *Robbins*, because appellate counsel competently raised an issue on Petitioner's behalf (i.e. insufficient evidence) it is difficult to find that counsel's performance was deficient.  *See Gibson*, 978 So. 2d at 1219.  But more importantly, the Court cannot find that counsel's performance was deficient because Petitioner's suggested claim would have had little validity on appeal.

To explain, and as Petitioner himself notes, a mistrial is a drastic remedy under Louisiana law.  *See State v. Smith*, 888 So. 2d 280, 285 (La. App. 5 Cir. 2004).  "When a witness makes an irrelevant remark which might prejudice the defendant, La.C.Cr.P. art. 771 gives a trial court the option either to admonish the jury or, if an admonition does not appear sufficient, to declare a mistrial."  *State v. Ducre*, 827 So. 2d 1120 (La. 2002).  Here, it is unlikely that the appellate court, if presented with the claim, would have reversed the trial judge's decision because it

appears that the judge was well within her discretion in denying the motion for mistrial and

opting instead to ask trial counsel if he preferred an admonishment.  This Court, at bottom,

cannot fault appellate counsel for making the tactical decision not to raise the claim on appeal.

*See Jones*, 463 U.S. at 746 (applauding advocates for "winnowing out weaker arguments on

appeal and focusing on one central issue if possible . . . ."); *Geiger v. Cain*, 540 F.3d 303, 309

(5th Cir. 2008) (recognizing that the decision not to seek a mistrial is frequently a strategic one).

In like manner, the state *habeas* court found that appellate counsel did not perform

deficiently.  [doc. # 23-6, p. 9].  That court also found that Petitioner had not shown that there

was a reasonable probability that the trial's result would have been different if appellate counsel

had raised Petitioner's suggested claim.  *Id.*  The state court's findings do not constitute an

unreasonable application of *Strickland*.  Therefore, Petitioner's claim should be **DENIED**.

D. <u>Claim Four: Insufficient Evidence</u>

For Petitioner's final claim, he argues that the State did not prove the elements of second

degree murder, which requires showing that he killed the victim while possessing the specific

intent to kill or to inflict great bodily harm.  [doc. # 13, p. 24].  Petitioner relies on three alleged,

"mitigating factors" to support his assertion: (1) both witnesses are convicted criminals and

testified inconsistently; (2) there was no fingerprint or DNA evidence tying him to the scene of

the crime; and (3) the bandage on his right hand prevented him from firing the murder weapon.

*Id.* at 25.

When a *habeas* petitioner asserts that the evidence presented to the court was insufficient

to support his conviction, the limited question before a federal *habeas* court is whether the state

appellate court's decision to reject that claim was an objectively unreasonable application of the

clearly established federal law set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002). A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

Here, the Louisiana appellate court properly invoked and applied the *Jackson* standard. *See Gibson*, 978 So. 2d at 1222. The appellate court first referenced the definition of second degree murder: "Second degree murder is defined in pertinent part as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm." *Id.* at 1223 (citing LA. REV. STAT. § 14:30.1(A)(1)). The appellate court then set forth the testimony presented at trial:

> Detective Trey Fulton testified that on April 14, 2005, he made contact with defendant in the interview room at Det. Fulton's office and explained defendant's constitutional rights to him with the aid of a Miranda rights form. According to Det. Fulton, defendant asked for a lawyer and refused to sign the form. Det. Fulton did not ask defendant any more questions, but when Det. Fulton told defendant that he was under arrest for the second degree murder of Freddrick Gray,[4] defendant asked how it could be murder when he was defending himself.

---

[4] Petitioner filed a motion to suppress the statements which was heard and denied. Petitioner also filed a motion to quash based on a speedy trial complaint which was also denied.

Latonya Simmons testified that she and defendant had a child together, but that she had broken up with him in 2005 and had been seeing Freddrick Gray since that time. Latonya indicated that defendant was jealous of her relationship with Gray that had been ongoing for a year and a half prior to the date of the shooting, April 14, 2005. Latonya stated that she also had a four-month-old son with Gray. Although she and Gray were not married, they had planned to wed and had obtained a marriage license.

Latonya related that on the day of the shooting, Gray had picked her up from work and had taken her to her mother's house where she and Gray were also living. Defendant tried to call Latonya, but she let the phone ring because she did not want to talk to him. Later, defendant called, and Gray answered and indicated to defendant that Latonya was not at home. According to Latonya, she and her stepfather were in the kitchen and Gray was in Latonya's brother's room playing a video game when defendant came into the house armed with a gun. Defendant was looking for Gray; he looked in the bedrooms and did not see Gray at first, but when he overheard Gray call out to Latonya to ask her what was wrong, defendant went into the bedroom where Gray was, pointed the gun at him and fired. Latonya testified that she saw the fire from the gun and that defendant fired four shots. Defendant then threatened Latonya's stepfather, who ran into Latonya's mother's room and locked the door. Defendant tried unsuccessfully to kick the door down, then saw Gray walking, holding his left arm, trying to get out of the house. Defendant snatched the phone that Latonya was dialing, threw it across the room and shot at Gray again. Gray went outside and fell off the front porch. Defendant then drove away in Latonya's car. Gray died at the scene.

On cross-examination, Latonya admitted being in jail twice for theft. Defense counsel went over the events of April 14, 2005, using a diagram of the home prepared by the state. Defendant's attorney was able to point out some minor inconsistencies between Latonya's testimony and statements she had made to police approximately two years earlier. Latonya testified that she and her stepfather were standing at a table when defendant entered; she denied telling Officer Trey Fulton after the incident that she and her stepfather were sitting at the bar. Latonya denied remembering defendant having a bandage or cast on his right hand, the hand in which Latonya said that defendant had held the gun. On redirect, Latonya mentioned that defendant had been in jail when she left him, and defendant's counsel made a motion for a mistrial that was denied.

Marco Aaron testified that at the time of trial, he was serving time in Arkansas for "commercial burglary-probation revocation." Aaron was 29 years old and was the stepfather of 22-year-old  Latonya Simmons (he was married to Latonya's mother, who was 39). Aaron was present at the time of the shooting, and his testimony largely corroborated that of Latonya as to the events that transpired. Like Latonya, Aaron stated that he did not notice a bandage or cast on defendant's hand. However, unlike his stepdaughter, Aaron remembered that he and Latonya were seated at the bar in the

house when defendant arrived. Aaron also remembered defendant firing five or six shots when he was in the bedroom and then maybe one or two more after that. However, Aaron admitted that he "didn't exactly count" the shots and he didn't know the exact number of shots fired.

Aaron also testified that he had run into his wife's bedroom and locked the door, but when defendant's attorney pointed out that Aaron had not told this to the police in his previous statement, Aaron responded, "It happened so fast-I just told them what happened." Additionally, Aaron recounted a prior incident in which he and defendant had a "little fist fight" at the end of which defendant had pulled a gun on Aaron, shot at the ground a couple of times, and hit Aaron with the gun before running away.

Lieutenant Keith Blackman of the Union Parish Sheriff's Office assisted at the crime scene, and his testimony was used to introduce photographs of the crime scene, along with three spent .380 caliber shell casings and one unfired cartridge found at the scene. On cross-examination, Lt. Blackman admitted that no one dusted for fingerprints because, from the information supplied by witnesses, they [police] "knew who they were looking for." The weapon used was never found despite what Lt. Blackman characterized as a thorough search. When asked if he knew how many times the victim had been hit, Lt. Blackman responded that he knew of one time, and the officer indicated that based upon his observation, Gray was struck by that bullet while in the front bedroom.

Dr. Stephen Venters, the coroner of Union Parish, testified that on the day of the shooting, he examined Freddrick Gray's body and saw a single gunshot wound to the left arm. The body was then sent to a forensic pathologist who performed an autopsy. Over a defense objection, Dr. Venters opined that, based on the autopsy report, the cause of death was a gunshot wound through the left arm and into the chest that caused Gray to "bleed out."

Detective Trey Fulton of the Union Parish Sheriff's Office testified that he responded on the day of the shooting to a complaint of homicide, and, after talking to Latonya and Marco Aaron, he developed defendant as a suspect. Detective Fulton stated that defendant was taken into custody and read his rights. As he had done at the motion to suppress hearing, Det. Fulton testified that defendant indicated that he wanted a lawyer, but when told that he was under arrest for second degree murder, defendant asked, "How can that be murder? I was just defending myself." Det. Fulton testified that they had no other suspects but defendant, and that nothing in the investigation was inconsistent with defendant having committed the crime.

Officer Keith Blackman was recalled to the stand in order to introduce a few more crime scene photos, including some "perimeter shots." Again, Lt. Blackman indicated that the scene was thoroughly searched for the weapon, but he admitted on

19

cross-examination that it was possible that a gun could have been hidden in the junk that was in the yard.

Chief Deputy Don McClanahan's testimony primarily focused on the search for the weapon at the crime scene, and added little to that of Keith Blackman. After Chief Deputy McClanahan testified, the state rested its case.

The defense began by recalling Marco Aaron to the witness stand. Aaron clarified that after the shooting, he called 911 and then ran down the street to a nearby police station. He also denied that he and his stepdaughter, Latonya Simmons, were lovers; he acknowledged the seven or eight-year age difference between them, however.

Next, the defense called Phyliss Gibson, defendant's mother, to the stand. Ms. Gibson testified that defendant and Latonya met in 2000 and were still seeing each other up until the time of the crime. Ms. Gibson stated that at the time of the crime, defendant had stitches in his right hand, which was bandaged. When asked if she was suggesting that defendant was unable to shoot Gray, she responded that his hand "was damaged so bad that he couldn't squeeze some-some (unintelligible)." Ms. Gibson testified that to the best of her knowledge her son did not own a pistol on April 14, 2005. She also testified that on the day of the shooting she had a phone conversation with Latonya Simmons and told her not to call back because, "(defendant) is upset and not thinking right, in his mind." When asked why defendant was upset, Ms. Gibson testified that he had been taking "them pills young folks be taking ..." She also indicated that defendant was upset because when he was in El Dorado "somebody had jumped on him, and he was steady crying and complaining about that and he was talking about his hand was hurting, and I knew if he talked to [Latonya], he would have been more upset ..." However, she then testified that defendant "should've been used to it, 'cause that [Latonya] was constantly doing the same thing every day' " and that "seemed like whenever he did talk to her on the phone, she never made things better. It was always a-they were always arguing on-back and forth on the telephone, or whatever the case may be." Ms. Gibson also testified that Latonya still wanted to be defendant's girlfriend and was having sex with him, and that when Latonya would come to Ms. Gibson's house, she would bring her other boyfriend [Freddrick Gray] with her. After Ms. Gibson's testimony, the defense rested.

*Id.* at 1220-1222.

Applying the *Jackson* standard, the appellate court held that the evidence in the case was sufficient to support Petitioner's second degree murder conviction.  *Id.* at 1223.  The court reasoned:

First, there is defendant's admission to police that he was the shooter, and it is not disputed that Gray died of a gunshot wound received at the crime scene. Second, there were two eyewitnesses, both of whom testified that defendant was the shooter; the witnesses' different recollection of their locations in the room when defendant entered armed with a pistol is not significant. A rational jury could have believed these witnesses, whose testimony was supported by that of the police officer to whom defendant admitted that he shot Gray in self-defense. At the same time, there was absolutely no evidence that defendant actually acted in self-defense. Instead, the evidence shows that defendant came to the house armed, looking for Freddrick Gray, whom defendant shot as soon as he located the victim. A rational jury also could have rejected the testimony of defendant's mother concerning defendant's allegedly injured hand. There was no corroboration of her testimony, neither of the witnesses remembered any bandage or cast on defendant's hand, and again defendant admitted being the shooter. Finally, in light of the evidence discussed above, it was of no moment that the gun used in the shooting was never recovered or that there was no DNA or fingerprint evidence linking defendant to the shooting.

*Id.*

Here, a review of the state court record shows that the appellate court's findings were entirely reasonable; thus, the Court cannot say that the state court's application of *Jackson* was objectively unreasonable. Petitioner's claim for relief based on insufficiency of the evidence should be **DENIED**.

## Conclusion

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for *habeas corpus* filed by Petitioner Gary Gibson, [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing. A courtesy copy of any objection or response

or request for extension of time shall be furnished to the District Judge at the time of filing.

Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  *See* 28 U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 13th  day of February, 2014.

Karen L. Hayes, U.S. Magistrate Judge